**APPENDIX: ADDITIONAL FACT PLEADINGS IN SUPPORT OF
MONELL CLAIMS**

**"CONTEMPT OF COP" AND "COVER CHARGE" ARRESTS**

1.    On information and belief, Defendant CITY OF NEW YORK has had notice of, and tacitly condoned, its police officers' custom, policy or practice of proffering pretextual and false charges against civilians for personal vindication and/or to putatively justify improper uses of force against civilians.

2.    In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

3.    On February 28, 2008, the Seattle Post-Intelligencer published an investigative review of six (6) years of Seattle Municipal Court files, wherein the Post-Intelligencer's investigators found that African-Americans in that predominantly Caucasian city were arrested solely on charges of "obstructing a public officer" and related crimes such as resisting arrest eight times as often as Caucasians.[1]

4.    The Seattle Post-Intelligencer's investigative review cited above also found that the Seattle City Attorney's Office dropped nearly half of all Seattle criminal cases predicated solely on charges of "obstructing a public officer" and related crimes such as resisting arrest between January 2002 and 2008.  See fn1.

5.    In response to Seattle police officers' questionable arrest activities discussed above, "Leo Poort, the [Seattle Police] department's legal adviser, included warnings about obstruction arrests in… his top twelve (12) tips to officers for 'avoiding civil liability lawsuits.'  'Don't arrest for 'contempt' of cop,' he wrote in tip No. 3. 'Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact. Flunking the 'attitude' test (is) not a bookable offense.'" See fn1.

6.    In a review of San Jose criminal cases published on October 31, 2009, the San Jose Mercury News reported that the Santa Clara County Prosecutor declined to prosecute over one-third (33.33…%) of resisting arrest cases brought by San Jose police,

---

[1] Nalder, Kamb and Lathrop, "Blacks Are Arrested on 'Contempt of Cop' Charge at Higher Rate,"  Seattle Post-Intelligencer, February 28, 2008.  Article incorporated herein by reference and available online at
http://www.seattlepi.com/local/353020_obstructmain28.asp

a rate that is markedly disproportionate to the Santa Clara County Prosecutor's general twenty percent (20%) decline-to-prosecute rate.[2]

7.    The San Jose Mercury News investigation cited above also found that the San Jose Police Department did not sustain or substantiate civilian complaints with respect to any of the ninety-nine (99) use-of-force cases that it reviewed in 2008, even though the San Jose Independent Police Auditor disagreed with police findings in twenty-five (25) of those 99 cases. See fn2.

8.    In response to the San Jose Mercury News investigation cited above, the San Jose Police Department instituted a new policy of tracking arrests where it appears that resisting arrest is being used as a cover charge to justify unnecessary and excessive police uses of force on civilians. See fn2.

9.    A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City police officers noted that at that time, Defendant City of New York did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest.[3]

10.    November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City police officers noted that at that time, Defendant City of New York did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest, despite considerable anecdotal evidence that New York City POLICE OFFICERS were arresting individuals on those and other like charges to justify use of force and/or to punish those individuals for "contempt of cop." See fn3.

11.    The above-cited New York Times special report noted that Los Angeles had already instituted a system for tracking the initiation and dispositions of "contempt of cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the time of that article's publication in 1997.  See fn3.

12.    Upon information and belief, the "contempt of cop" and "cover charge" charges levied most regularly by New York City POLICE OFFICERS are disorderly conduct, resisting arrest and obstruction of governmental administration.

---

[2] Webby, Sean, "Mercury News investigation: San Jose police often use force in resisting-arrest cases,"  San Jose Mercury News, October 31, 2009.  Article incorporated by reference herein and available online at http://www.mercurynews.com/top-stories/ci_13686438?nclick_check=1

[3] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997.  Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A96195 8260&scp=8&sq=contempt+of+cop&st=cse&pagewanted=all

**13.**   Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and charges arising from alleged possession of small amounts of artificial or actual "planted" controlled substances are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interactions.

**14.**    Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and charges arising from alleged possession of small amounts of controlled substances are relatively easy for police to levy in the absence of actual probable cause because they can be levied solely upon the allegations of the arresting officer(s) without reference to physical evidence (save evidence of controlled substances "planted" by the arresting officers) or witness observation of criminal acts.

**15.**   Upon information and belief, to date, Defendant City of New York has not implemented any particular, training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and charges arising from alleged possession of small amounts of artificial or actual "planted" controlled substances.

**16.**   Upon information and belief, and despite due and repeated notice that New York City POLICE OFFICERS have an ongoing custom or practice of charging individuals with crimes and violations for personal vindication and/or as pretexts to justify use of force, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" charges.

**17.**   Upon information and belief, and despite due and repeated notice that New York City POLICE OFFICERS have an ongoing custom or practice of charging individuals with crimes and violations as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" charges.

**18.**   Upon information and belief, and despite due and repeated notice that New York City POLICE OFFICERS such as the Defendant POLICE OFFICERS have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, obstruction of governmental administration, and possession of small amounts of artificial or actual "planted" controlled substances as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant City of New York has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-

called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and possession of small amounts of artificial or actual "planted" controlled substances.

### THE PRACTICE AND CUSTOM OF THE NEW YORK CITY POLICE DEPARTMENT OF PERMITTING ITS OFFICERS TO ENGAGE IN POLICE BRUTALITY AND USE OF EXCESSIVE FORCE

_____

**19.**    On information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons and persons' property.

**20.**    In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

**21.**    On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report," "The Report").[4]

**22.**    The Mollen Commission Report was subtitled "ANATOMY OF FAILURE: A PATH FOR SUCCESS."  The Report at page before "i."

**23.**    The July 7, 1994 Mollen Commission Report was prepared for and at the request of the Defendant City of New York, and therefore knowledge of its contents may be imputed to Defendant City of New York.

**24.**    The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence."

**25.**    The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994 Mollen Commission Report.

_____

[4] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York.  Incorporated by reference herein and available online at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

26.    One police officer who testified before the Mollen Commission explained that the code of silence "…starts in the Police Academy, and it just develops from there…. It starts with the instructors telling you never to be a rat, never give up your fellow officer.  It starts with other recruits telling you they'll never give you up, and it just goes down the line as you go… into a precinct."  The Report at 55.

27.    Another officer who testified before the Mollen Commission stated that "[c]ops don't tell on cops.  And if they did tell on them, just say if a cop decided to tell on me, his career's ruined.  He's going to be labeled as a rat…. he's going to have nobody to work with.  And chances are if it comes down to it… [the whistleblower's fellow officers are] going to let him get hurt." The Report at 53-54.

28.    A third officer who testified before the Mollen Commission concurred, stating: "[i]f you're labeled a rat… you're going to have a difficult time for the remainder of your career…. [i]t was something that you couldn't shake." Id. at 54.

29.    An NYPD lieutenant who testified before the Mollen Commission confirmed that officers are at times "ostracized" for breaking the code of silence. Id.

30.    An NYPD captain who disciplined his subordinates for misconduct and reported allegations of corruption to NYPD Internal Affairs explained to the Mollen Commission that he had been transferred to thirty-eight (38) different commands in the course of his career, and in almost every case "he found evidence that his reputation had preceded him.  At one command, his locker was burned; at another, his car tires were slashed; at another, he received threats of physical harm." Id.

31.    The *Mollen Commission Report* explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

32.    The *Mollen Commission* went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

33.    The *Mollen Commission* found that "[police b]rutality is… used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

34.    One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance.  It's not simply giving a beating.  It's the other officers begin [sic] to accept you more." Id.

35.    The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence…. [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the… [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse."  The Report at 49.

36.    As of the July 7, 1994 *Mollen Commission Report,* Defendant City of New York had notice that the officers and commanders of the New York City Police Department tolerated and encouraged police to lie to cover up the wrongful conduct of themselves

and their fellow officers, including brutal conduct like that which was perpetrated by Defendant "John Doe" POLICE OFFICERS upon Plaintiff SIMEON VINCENT.

    **37.**    On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

    **38.**    On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

    **39.**    The failure of Defendant CITY OF NEW YORK to meaningfully address these issues was underscored when the non-governmental organization Human Rights Watch conducted a study examining common obstacles to accountability for police abuse in fourteen large cities, including Atlanta, Boston, Chicago, Detroit, Indianapolis, Los Angeles, Minneapolis, New Orleans, New York, Philadelphia, Portland, Providence, San Francisco, and Washington, D.C.[5]

    **40.**    Research for this report was conducted over two and a half years, from late 1995 through early 1998.  See fn5.

    **41.**    The report stated: "The barriers to accountability are remarkably similar from city to city. Shortcomings in recruitment, training, and management are common to all. So is the fact that officers who repeatedly commit human rights violations tend to be a small minority who taint entire police departments but are protected, routinely, by the silence of their fellow officers and by flawed systems of reporting, oversight, and accountability. Another pervasive shortcoming is the scarcity of meaningful information about trends in abuse; data are also lacking regarding the police departments' response to these incidents and their plans or actions to prevent brutality. Where data do exist, there is no evidence that police administrators or, where relevant, prosecutors, utilize available information in a way to deter abuse." See Id.

    **42.**    The report documented that the official response of the New York City Police Department and the City of New York, to credible, persistent reports of abuse was to deny the existence of the problem. See Id.

    **43.**    The report documented that the New York City Police Department, and the City of New York failed to discipline officers in all but 1% of incidents in which complaints were filed with the Civilian Complaint Review Board. See Id.

    **44.**    Upon information and belief, the report was presented to Mayor Rudy Giuliani of the City of New York.

---

[5] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998.  Report incorporated by reference herein and available online at
http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspo html/toc.htm.

**45.**    Upon information and belief, the Mayor denounced the report without reading it.

**46.**    Upon information and belief, Kenneth Roth, then Executive Director Human Rights Watch wrote in an open letter to the Mayor on July 14, 1998: "Rather than engage in a serious discussion of the problem of police brutality in New York City, you attacked those who raised the issue -- apparently without even reading the advance copy of the report we had sent you."

**47.**    Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force, but has failed to take action to remedy the problem.

**48.**    That the Defendant City of New York continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

a.    **Ariza v. City of New York**, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers…. [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

b.    **White-Ruiz v. City of New York**, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996) ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]

c.    **United States v. Rosario**, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]

d.    **Barry v. New York City Police Dep't**, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence…. Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."]

e.    **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff detective sues on pattern of retaliation following his reporting fellow detective to Internal Affairs, fellow officers cover for detective accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective] Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful…. [a]s a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated."]

**49.**    Upon information and belief, the above-referred constitutionally violative

policies, practices and customs remain widespread, open, and notorious throughout the NYPD to date.

**50.**    Upon information and belief, the policymakers of the NYPD and Defendant City of New York are aware that these practices and customs of NYPD officers continue to date, and have failed to take adequate steps to curb these practices and customs, which regularly cause the violation of citizens Constitutional rights.

**51.**    Defendant City of New York has failed to meaningfully curb these Constitutionally-violative customs and practices to date.

**52.**    In the introduction to the Mollen Commission Report, it is noted that "the [Internal Affairs] system designed to protect the [New York City Police] Department from corruption minimized the likelihood of uncovering it." The Report at 3.

**53.**    The Mollen Commission Report explained that at that time, the Internal Affairs Division (re-named the Internal Affairs Bureau in a 1993 restructuring) attempted "to close cases with as little effort as possible…. One officer told us they sit around and 'eat donuts and do crossword puzzles' -- and the supervisors and commanders did little more…. an anonymous survey of the work conditions and attitudes of IAD investigators… revealed that almost half of IAD investigators' time was spent on non-investigatory matters  --  and more of their 'investigative' work was done without ever leaving their office…. The facts confirmed IAD's do-nothing reputation." The Report at 85

**54.**    Since the Mollen Commission Report was published in 1994, the number of complaints of police corruption and other misconduct logged annually by NYPD Internal Affairs has nearly quadrupled, rising from 14,789 logs received in 1994 to 44,994 logs received in 2006, the last year for which NYPD reporting is available.  *NYPD Internal Affairs 2006 Annual Report*, 12-13.[6]

**55.**    Over that same time period, the number of corruption and other police misconduct complaints investigated annually by NYPD Internal Affairs has fallen by more than half, from 2,258 investigations in 1994 to 1057 investigations in 2006. *Id*.

**56.**    More up-to-date information relating to these customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department is available in "THE PRICE OF BRUTALITY: A special report.; Police Complaints Settled, Rarely Resolved." *The New York Times*, September 17, 1997.[7]

**57.**    Upon information and belief, the steady decline in investigations by NYPD

---

[6] 1993-2006 Internal Affairs Reports available online at http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports.

[7] Sontag, Deborah & Barry, Dan, *The New York Times*, Sept. 17, 1997 available online at http://www.nytimes.com/1997/09/17/.../price-brutality-special-report-police-complaints-settled-rarely-resolved.hmtl.

Internal Affairs since the publication of the Mollen Commission Report is representative of a return to a "business-as-usual" mentality with respect to police corruption and brutality within the NYPD.

**58.** Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively fulfilling its mandate of policing NYPD corruption and brutality generally.

**59.** Upon information and belief, Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively curbing the established and widespread customs and practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

**60.** Defendant City of New York has also had notice that the New York City Civilian Complaint Review Board ("CCRB") has not been effective in curbing the above-referred practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

**61.** This is not a new phenomenon; in <u>Sango v. New York</u>, 1989 U.S. Dist. LEXIS 18214, 40-41 (S.D.N.Y. June 19, 1989), the court found that CCRB investigations into police misconduct were so grossly inadequate that "their predictable results could have led… officers to believe that their conduct, no matter how improper, would go unpunished."

**62.** That Defendant City of New York had knowledge of its continuing failure to abate the above-referred practices and customs can be shown with reference to the following facts reported to the City in the *2006 Annual Report* of the CCRB:[8]

a.    Only 12,059 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 received full investigations. *CCRB 2006 Annual Report*, 93.

b.    Only 1,441 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 resulted in a finding of even one substantiated allegation. *Id.*

c.    The NYPD either took no disciplinary action whatsoever or merely issued instructions in 1,062 of the 1,918 cases of CCRB-substantiated police misconduct closed by the department between 2002 and 2006. Some of these cases had been forwarded to the NYPD by the CCRB before 2002. *Id.* at 101.

d.    In the five years between 2002 and 2006 only one (1) NYPD officer was subject to employment termination as a result of allegations of misconduct substantiated by the CCRB. *Id.* at 100.

e.    The CCRB substantiated only 3.5% of the excessive force allegations reported between 2002 and 2006. *Id.* at 95.

---

[8] 2001-2010 CCRB Reports available online at http://www.nyc.gov/html/ccrb/html/reports.html.

63.    The New York Civil Liberties Union report on the CCRB's activities between 1994 and 2006, entitled "Mission Failure: Civilian Review of Policing in New York City 1994-2006" ("NYCLU Report")[9] reviewed, collated and summarized information from the CCRB's Annual Reports and other sources, resulting in the following findings:

a.    CCRB complaint data indicates that serious police misconduct, including improper threats and use of force, occurs with significant frequency, with allegations of excessive force in half of all complaints filed with the CCRB.  NYCLU Report at  4.

b.    The NYPD takes no disciplinary action whatsoever against nearly 30% of officers named in substantiated CCRB complaints, and gave only "instructions" to nearly a third of officers who were disciplined following substantiated CCRB complaints between 2000 and 2005.  Id. at 5.

c.    "In recent years it appears that the NYPD has adopted a radically more lenient disciplinary standard as regards acts of police misconduct directed at civilians. In 2004 the police department ordered instructions in approximately 30 percent of all disciplinary actions related to a substantiated CCRB complaint. In 2005 instructions represented nearly 60 percent of such disciplinary actions; and in 2006 instructions rose to 72 percent of all disciplinary actions related to police misconduct directed at civilians. Suspension of a police officer has become an extraordinarily rare occurrence, even when egregious acts of misconduct are involved."  Id. at 6.

64.    In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

65.    In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the Defendant City of New York knew or should have known that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

66.    The policy of failure to screen, discipline, supervise, counsel, transfer, control, and correct unconstitutional patterns or conditions, is evidenced, *inter alia*, by the cases and reports cited above.

67.    Upon information and belief, Defendant, CITY OF NEW YORK, and the New York City Police Department failed to effectively screen, train, supervise and discipline its police officers, including, but not limited to, Defendant "John Doe" POLICE OFFICERS, as demonstrated by their propensity for group violence, including excessive use of force and restraint, and for their failure to protect citizens from unconstitutional conduct of other police officers.

68.    Upon information and belief, Defendant CITY OF NEW YORK, failed to put into

---

[9] Available online at http://www.nyclu.org/files/ccrb_failing_report_090507.pdf.

place and otherwise maintained an inadequate structure for risk containment and stress management relative to its police officers. *Inter alia*, the structure was deficient at the time of pre-selection and selection to evaluation and exchange within the command structure about the performance of individual police officers; to the training of supervisory personnel to effectively and adequately evaluate performance of an officer; and to otherwise put the command structure on notice that an individual was at significant levels of risk to the public at large or to specific segments thereof.

69.    The net effect of these deficiencies and failures was to permit police officers of the New York City Police Department to function at levels of significant and substantial risk to the public.

70.    Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality, choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

71.    Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

72.    Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

## UNCONSTITUTIONAL ARREST QUOTAS ILLEGALLY IMPLEMENTED BY THE NEW YORK CITY POLICE DEPARTMENT

73.    Upon information and belief, police officers in the New York City Police Department, including the Defendant POLICE OFFICERS, are trained, ordered or encouraged to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

74.    Said quantitative enforcement "productivity goals" can also be referred to as arrest quotas.

75.    The need to meet arrest quotas can induce police officers to make arrests in the absence of probable cause.

76.    Upon information and belief, the arrest quotas promulgated by Defendant CITY OF NEW YORK induce New York City police officers, such as the Defendant "John Doe" POLICE OFFICERS herein, to make arrests in the absence of probable cause, in violation of the constitutional rights of individuals to be free from unreasonable seizures.

**77.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy was confirmed as a finding of fact when, on February 18, 2011, the jury in *Bryant v. City of New York*, Kings County Supreme Court Docket #022011/2007, found that the plaintiff in that case's arrest had resulted from a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest" imposed by Defendant City of New York.

**78.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may additionally be inferred from repeated occurrences of similar wrongful conduct, as documented in lawsuits including but not limited to the following civil rights actions filed against the City of New York:

•    ***Alvin Williams v. The City of New York et al.***, United States District Court, Southern District of New York, 05 CV 4013.

•    ***Corey Williams v. The City of New York et al.***, United States District Court, Eastern District of New York, 07 CV 5362.

**79.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the admission by Deputy Commissioner Paul J. Browne, as reported by the media on November 8, 2010, that commanders are permitted to set "productivity goals."[10]

**80.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn.  See fn10.

**81.**    Attached hereto as **Exhibit "B"** are copies of the quantitative target sheets obtained from the 77th Precinct by or on behalf of the New York Daily News, as referenced in the aforesaid November 8, 2010 New York Daily News article.

**82.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tapes recordings acquired by WABC-TV/DT, including, among other admissions, a 41st precinct sergeant explaining that each of his officers is held to a twenty summons per month and one arrest per month enforcement quota, as reported by the media on March 3, 2010.[11]

**83.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make

---

[10] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at
http://www.nydailynews.com/ny_local/2010/11/08/2010-11-
08_cops_told_to_meet_quotas.html.

[11] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at
http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

"special" arrests as directed by their superiors even if they must void the arrests at the end of their shifts, as reported by the media on May 11, 2010.[12]

**84.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the full page color advertisement placed by the Patrolmen's Benevolent Association of the City of New York in the May 7, 2012 edition of the New York Daily News, which states "Don't Blame the Cop[,] Blame NYPD Management For the pressure to write summonses and the pressure to convict motorists[.]   Because of ticket quotas, New York City police officers are being pressured to write summonses to as many motorists as possible…. "   A reproduction of the advertisement in question is attached hereto as **Exhibit "C**."

**85.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may still further be inferred from an report by the New York Daily News

**86.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred to have continued to the present date from the May 16, 2012 opinion granting class certification in *Floyd et al. v. The City of New York et al.*, SDNY 08-CV-1034 (SAS) [Document 206], in which the Honorable District Judge Shira A. Scheindlin noted the existence of a Police Officer Performance Objectives Operations Order dated October 17, 2011, in which "Commissioner Kelly directed all commands that 'Department managers **can** and **must** set performance goals,' relating to 'the issuance of summonses, the stopping and questioning of suspicious individuals, and the arrests of criminals.'" *Floyd* Document 206 at 18-19, citing 10/17/11 Police Officer Performance Objectives Operations Order.  (emphasis in original)

## DEFENDANT CITY OF NEW YORK'S AWARENESS AND AQUIESCENCE TO BRONX, NEW YORK NYPD OFFICERS' CONTINUING CUSTOM AND PRACTICE OF — TARGETING MINORITY INDIVIDUALS, CHARGING THEM WITH CRIMES RELATING TO DRUG POSSESSION, AND SUBJECTING THEM TO EXCESSIVE FORCE — AND ITS FAILURE TO ADEQUATELY TRAIN OR OTHERWISE PREVENT ITS OFFICERS FROM ENGAGING IN THE SAME

**87.**    On February 9, 2012 The Guardian published an article entitled, "Bronx Teenager Beaten By Police Calls on New York Governor to Investigate," describing two recent terrible examples of Bronx police officers' attacks on African-American young men similar to Plaintiff JAMAANE NELSON.  One example, similar to Defendants' conduct toward Plaintiffs, concerned 19-year-old Jateik Reed's mother, Schuan Reed, and her son, Jashuan (17) who "headed to the [42nd] Precinct to inquire about Jateik [and were] then arrested and allegedly assaulted and threatened by police officers . . . [More specifically when they] went to walk out [of the 42nd Precinct the police officers] stopped

---

[12] Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town."  Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

[them], just snatched Jashaun, threw him on the floor and started hitting him. [Thereafter Mrs. Reed said] 'Hey, what are you doing?' [and the police officers] snatched [her], threw [her] on the floor [and would eventually arrest both Jashuan and Ms. Reed]"[13]

**88.**    Jateik Reed's mother, Schuan Reed, is still facing charges under the "contempt of cop" trilogy discussed above, to wit, Disorderly Conduct, Resisting Arrest, and Obstruction of Governmental Administration, along with a charge of endangering the welfare of a child, under Bronx Supreme Court, Criminal Term docket number 05819C-2012.  All of these charges allegedly arise from Mrs. Reed's attempt to get information from police at the 42nd Precinct regarding her son Jateik Reed's arrest and brutal beating at the hands of police.

**89.**    How Mrs. Reid was endangering the welfare of a child by inquiring with police as to the status of her brutalized and arrested son is as yet unclear.

**90.**    Similar to Defendants' initial seizure of Plaintiff JAMAANE NELSON, in a video taken of the incident the police officers involved in the stop of Jateik Reed "are seen hitting [Jateik] in the back with the batons while he is curled up on the pavement . . . . [and still] after they arrested him [Ms. Reed has] witnesses that say [the police officers were] still beating him in the [police] van [and] still beat him when they brought him to the precinct [,to wit,] [s]prayed him in the face with mace in the precinct and everything." See fn13.

**91.**    Also reminiscent of Defendants' initial seizure of Plaintiff JAMAANE NELSON is the stop of and fatal shooting of 18-year-old Ramarley Graham, whom the NYPD alleged "ran into his home after being ordered [by the officers involved] to stop."  Again, contrary to the NYPD's allegations and similar to the conduct of Plaintiff JAMAANE NELSON when walking toward the home, "[v]ideo provided by Graham's landlowlord, however, appears to show [Ramarley] walking, not running, into his home [until] [m]oments later police officers are seen running up after him [and then] [a]fter a few minutes of kicking the front door an officer [can be seen] gaining entry into the building from the back door [just before] [Ramarley] was killed." See fn13.

**92.**    Shortly after entering Ramarley's home without a warrant, although more severe than Defendant POLICE OFFICER RODA's pepper spraying and kicking of Plaintiff

---

[13] Devereaux, Ryan "Bronx Teenager Beaten by Police Calls on New York Governor to Investigate" The Guardian, February 9, 2012. Article incorporated herein by reference and available online at: http://www.guardian.co.uk/world/2012/feb/09/bronx-teenager-police-new-york; see also Meminger, Dean, "NYPD Investigate Bronx Violent Arrest Caught On Video," New York 1, January 30, 2012.  Article incorporated herein by reference and available online at http://www.ny1.com/content/top_stories/155122/nypd-investigates-bronx-violent-arrest-caught-on-video. ("Reed's mother, brother and friend went to the local police precinct to ask about the arrest, and they were arrested as well.")

JAMAANE NELSON in the home, it is "undisputed that [the police officers shot Ramarley] in his grandmother's bathroom, and no weapon [was] recovered [from Ramarley]." See fn13.

**93.**    As discipline for the conduct of the officers involved in the fatal shooting of Mr. Graham, "The officer who shot Ramarley and his partner [were] placed on modified desk duty." See fn13.

**94.**    Only days after the fatal shooting of Ramarley and the brutal beating of Jateik, Bronx residents displayed, "massive outpouring[s] of grief and anger throughout the city [shown through] [m]ultiple rallies and marches that [were] held in the Bronx [including] [a] rally that began in front of [Ramarley's] home . . . [that] drew several members of the community, who marched to the 47th Precinct demanding justice." See fn13.

**95.**    Upon information and belief, the Defendants' arrest, excessive uses of force, and contemplated charges of criminal possession of controlled substances against Plaintiff JAMAANE NELSON and disorderly conduct against Plaintiff GRACE NELSON were part of a pattern of continuing, pervasive misconduct also including the acts undertaken against Jateik Reed and his family, as well as Ramarley Graham.

**96.**    Upon information and belief, Defendant CITY OF NEW YORK and the New York Police Department were and continue to be aware of the 47th Precinct's and its officers' policy, custom, or practice of targeting minority individuals, falsely charging them with crimes and violations, and subjecting them to excessive force.

**97.**    Upon information and belief, Defendant CITY OF NEW YORK and the New York Police Department were and continue to be aware of the Bronx police precincts and their officers' policy, custom, or practice of targeting minority individuals, falsely charging them with crimes and violations, and subjecting them to excessive force.

**98.**    Upon information and belief, despite the shocking conduct of police officers from the 47th and 42nd precinct who were involved in the brutal beating of Mr. Reed and the fatal shooting of Mr. Graham, neither Defendant CITY OF NEW YORK nor the New York City Police Department have taken adequate steps to effectively train or otherwise prevent its Bronx police officers from engaging in similar conduct.

**99.**    Further instances of similar conduct pre-dating the incident and arrest in question appears in a February 23, 2011 Gothamist article; wherein two members of the NYPD arrested 19-year-old Jorge Cartagena Jr., a Latino residence of the Bronx, for riding his bicycle on the sidewalk and, after Mr. Cartagena Jr. allegedly resisted his arrest, the same officers "slammed his head against the floor repeatedly and [while] one [of the] officers kicked him in the ribs."[14]

---

[14] Del Signore, John "Cops Cleared in Teenny Bicyclist Bodega Arrest" Gothamist, February 23, 2011 Article incorporated herein by reference and available online at:

**100.**  Although this arrest was investigated by the IAB, the NYPD, following the IAB investigation, concluded that the arresting officers, "[f]ollowed proper protocol"; specifically, Police Commissioner Ray Kelly "told reporters that neither cop would be charged with any wrongdoing." See fn14.

**101.**  Still further incidents arising in the Bronx before the incident in question include Tyre Davis, a Bronx teen who was "beaten by two police officers just steps from the 46th Precinct stationhouse after asking one of the cops for his badge number."; and then moments later after Mr. Davis had left the precinct, "[The officers] accosted [Mr. Davis] several yards away from stationhouse and punched him to the ground [and] the officers then took turns kicking Mr. Davis in the face, head, and upper body."[15]

**102.**  Even though the officers who beat Tyre Davis were criminally charged with assault five months following the incident, neither the Defendant CITIY OF NEW YORK nor the New York Police Department which it oversees are reported to have taken any disciplinary action against the officers. See fn15.

**103.**  Repeated instances of such as those mentioned above evidence Defendant CITY OF NEW YORK and the New York City Police Department's continuing custom, practice or policy of frustrating efforts at police accountability and instead condoning carte blanche disregard for the constitutional rights of the African-American and Latino communities within the Bronx, New York.

---

http://www.google.com/search?client=safari&rls=en&q=gothamist+newspaper&ie=UTF-8&oe=UTF-8

[15] Montero, Douglas "Bronx Teen Beaten by Two Police Officers Filing Federal Civil-Rights Suit Against NYPD" New York Post, April 26, 2012
Article incorporated herein by reference and available online at:
http://www.nypost.com/p/news/local/bronx/bronx_against_beaten_rights_suit_UvSunh7s VeyTyR9Dlp6khM

DATED:      New York, New York
            October 10, 2012




                        Respectfully submitted,


                        _____~//s//~_____
                        SAMUEL B. COHEN [SC 0622]
                        STECKLOW COHEN & THOMPSON
                        10 SPRING STREET – SUITE 1
                        New York, New York 10012
                        [212] 566-8000
                        [212] 202-4952/FAX
                        SAM@WYLIELAW.COM
                        ATTORNEYS FOR PLAINTIFFS

50